181 A.2d 86 (1962)
LIGHT & POWER CONSTRUCTION COMPANY, a corporation of the State of Delaware, Plaintiff,
v.
J. H. Tyler McCONNELL, Benjamin Ableman and J. Henry Topkis, being the members of Delaware Interstate Highway Division, State Highway Department, State of Delaware, Tim O'Connell and John B. O'Connell, Trading as Tim O'Connell & Sons, and Isaac Watkin, Defendants.
Court of Chancery of Delaware, New Castle.
April 27, 1962.
*87 Donald W. Booker, of Coxe, Booker, Walls & Cobin, Wilmington, for plaintiff.
James L. Latchum, of Berl, Potter & Anderson, Wilmington, for defendants, J. H. Tyler McConnell, Benjamin Ableman and J. Henry Topkis, members of the Delaware Interstate Highway Division.
Wilfred J. Smith, Jr., of Smith & Gentile, Wilmington, for defendants, Tim O'Connell and John B. O'Connell, trading as Tim O'Connell & Sons.
Defendant Isaac Watkin has not yet been served.
SEITZ, Chancellor.
This is the decision on plaintiff's application for a preliminary injunction to prevent defendants from performing or permitting performance of certain electrical work on a structure being built at the Delaware Memorial Bridge. Plaintiff was granted a restraining order. Light & Power Construction Co. v. McConnell (Del.Ch.), 177 A.2d 633.
Plaintiff is an electrical contractor. Late in 1961, the Delaware Interstate Highway Division ("Division") which operates the Bridge, advertised for bids to construct a sand storage shed to be built at the Bridge. The Division admits that it followed the procedure contained in the Code provisions relied upon by plaintiff but it says that this was a matter of choice rather than law. When the bids of the general contractors were opened December 18, 1961, the defendant O'Connell's bid was the lowest at $67,500 and it listed plaintiff as its electrical subcontractor. Plaintiff was selected by O'Connell on the basis of an oral quotation solicited by O'Connell.
The next day, December 19, 1961, O'Connell appeared at a regular meeting of the Division and represented that he had been contacted by a business agent of a local electrical union and warned that plaintiff would not be permitted to work on the job because O'Connell was not unionized and plaintiff, as a union contractor, was committed not to bid to or perform work for a non-union contractor; that O'Connell could expect either picketing at the job site or the withholding of electrical workers by the union from plaintiff if plaintiff failed to abide by its contractual understanding with its union. O'Connell also said that plaintiff knew at the time it gave its bid that O'Connell was a non-union contractor. O'Connell said he was giving the information to the Division so that it could determine whether the contract should be awarded to O'Connell. He thereafter formally requested permission to withdraw his bid proposal. On the advice of its counsel the Division in effect refused O'Connell's *88 request and awarded his firm the contract.
Sometime later O'Connell presented plaintiff with a proposed form of subcontract which contained a provision which indemnified the General Contractor against all losses, liabilities, suits, etc. incurred by Contractor "on account of failure of subcontractor to perform agreements herein". Plaintiff notified O'Connell that it would sign a contract in the form provided by the General Conditions and adopted by the Division. Thus, plaintiff says it was ready and willing to sign a contract in accordance with the terms of its bid and that O'Connell was the one who insisted on a contract with an indemnification provision which was not a customary provision in such a subcontract. Defendants tacitly concede that the "added" provision was not a customary one in the trade.
On January 12, 1962, the Division's secretary sent O'Connell copies of a proposed contract. On January 23, 1962, the Division's secretary received a letter from O'Connell enclosing the executed copies and stating that O'Connell had substituted Watkin, an electrical contractor, in place of plaintiff for the reason that plaintiff had declined to sign the subcontract which O'Connell had submitted to plaintiff. O'Connell requested approval of the substitution.
Before O'Connell's letter requesting a substitution had in fact been received, O'Connell appeared before a meeting of the Division's board on January 23, 1962 and represented, according to the Division's resolution, that plaintiff "refused to sign a subcontract for the electrical work in accordance with its previous bid proposal given to the contractor." O'Connell requested leave to substitute Watkin for plaintiff. The Division, admittedly without attempting to contact plaintiff in any way, immediately passed a resolution which in its operative part provides as follows:
"NOW THEREFORE BE IT RESOLVED, the Division having considered Contractor's request and being satisfied, in good faith, that Light & Power Construction Company has defaulted in refusing to execute a subcontract as represented to the Division by the contractor, and Pacific National Fire Insurance Company of San Francisco, California, surety on Contractor's bond, having approved of the said substitution, and upon the recommendation of the Division's Engineering Staff and the Architect, the Division does hereby grant its written consent and permission to the contractor to substitute Isaac Watkin as the electrical subcontractor in the place of Light & Power Construction Company for the performance of the electrical work to be performed under Contract No. 48; and
"The Division's Engineering Staff is hereby authorized to advise the contractor in writing of the consent and permission given by this resolution."
The record is in dispute, but it is plaintiff's sworn position that he was not aware that O'Connell intended to apply for a substitution and that he was not aware of the Division's action until after it had officially sanctioned the substitution.
Work was commenced by O'Connell and Watkin on January 25, 1962. Plaintiff promptly objected to the legality of the substitution and after its protest was overruled, it commenced this action on February 7, 1962. The defendant Watkin has completed about half of the electrical work. The Division and O'Connell are now restrained from permitting the completion of such work. In view of the weather and work schedule the restraint is not now in fact interfering with progress under the contract.
I should note that after the restraining order was entered some of the defendants served motions to produce and interrogatories upon plaintiff. By these procedural devices defendants sought in substance to *89 obtain documents and material which would support their claim that at the time plaintiff submitted its oral bid to O'Connell it had commitments with certain union and management organizations not to bid to or perform work for non-union contractors. Plaintiff objected to such discovery on the ground of relevancy and the court in an unreported opinion sustained the objection. The court's reasoning was that under what was assumed to be the governing statute the Division had a responsibility to make a good faith determination as to whether it would allow a substitution of subcontractors on a ground permitted by the statute. Otherwise stated, the court felt that if the Division had not made a good faith determination within the meaning of the statute it should not be permitted to shift that responsibility to the court by now asserting a defense attacking the plaintiff's good faith.
Before considering the defenses raised by defendants, I should emphasize that nowhere do any of the defendants charge that plaintiff indicated that it would not or could not perform the work covered by its bid. Defendants were afraid that if plaintiff took the job there would be labor trouble presumably directed at plaintiff which would prevent plaintiff from performing its contract and thereby inhibit O'Connell from fulfilling its undertaking to the Division. Thus, the Division permitted the substitution solely on the ground that the plaintiff refused to sign a subcontract. There is nothing in the record to show whether the Division was aware at the time it took its action that O'Connell was willing to sign a contract which contained the "usual" provisions.
One other point should be mentioned. The Division reiterates that it only had a contractual relationship with the General Contractor and not with plaintiff. This is so but it does not alter the fact that, if 29 Del.C. § 6910 applies, the Division also owed a statutory duty which affected the relationship of plaintiff as subcontractor and O'Connell as general contractor.
The defendants first claim that 29 Del.C. § 6910 is inapplicable to the work contract here involved or alternatively is applicable only to the extent the Division determined to be bound by it. That section provides:
"After the contract for any public work costing more than $5,000 is let unto any bidder, no bidder shall substitute another subcontractor for any subcontractor whose name is set forth in the bidder's accompanying statement without the written consent and permission so to do having theretofore been given by the officer, agency, department or political subdivision of the State under whose jurisdiction such public work is being performed. No such express consent and permission so to do shall be given unless it is established to the satisfaction of such officer, agency, department or political subdivision, in good faith, that the subcontractor in question whose name is listed in the bidder's accompanying statement has defaulted in performance of the part of the work covered by the subcontract, or is no longer engaged in such business."
I first consider defendants' contention that the "maintenance shed" is a "bridge structure" and as such covered by the special legislation applicable thereto which is contained, inter alia, in 17 Del.C. § 301 et seq. The Division points out that under 17 Del.C. § 301 the word "bridge" is defined to include the bridge itself and "* * * all other buildings and structures connected with the Bridge, * * *". I am satisfied that the structure covered by the present contract is embraced within the "bridge" definition found in 17 Del.C. § 301. That section as it now stands was last amended in the 1944-45 session of the General Assembly (45 Del.Laws, Chap. 274, § 13). With language changes not here important it was incorporated into the 1953 Code and remains there unchanged.
Defendants next say that the special "bridge" statute found in 17 Del.C. § 305 *90 controls the Division in awarding contracts for the erection of such structures rather than 29 Del.C. § 6910. Section 305, which was last amended in 1947 (46 Del.Laws, Chap. 193, § 1), and incorporated in that form into the 1953 Code, clearly was intended to grant to what is now the Division the power to make contracts covering the erection of structures such as that here involved. It was also given the power to establish rules and regulations applicable to the making and performance of contracts covering such work with specific limitations which are therein contained. Among the limitations made binding on the Division is that found in 29 Del.C. § 6902 which called for a contractor's bond to secure any money due any person furnishing materials or performing labor in and about such project.
Defendants say the reference to this mandatory provision in § 305 makes it evident that the Legislature did not intend to make other statutory provisions, such as 29 Del.C. § 6910, binding on the Division. I cannot agree for reasons which will appear from a study of the chronological history of the adoption of the statutes.
Let me say parenthetically that defendants do not claim that the shed would not come within the term "public building" found in 29 Del.C. § 6908, which really defines the term "public work" found in 29 Del.C. § 6910.
At the time 17 Del.C. § 305 (dealing with the Bridge) was last amended in 1947, what is now 29 Del.C., § 6910 was not in existence. It was approved by the Governor June 5, 1951 (48 Del.Laws, Chap. 320).
It should be noted that 17 Del.C. § 305 does not explicitly cover the subject of subcontractors. Assuming without deciding that it is to be construed to grant the Division power, by rule or regulation, to embrace subcontractors, it is evident that the Legislature could alter any such grant of power. By its action in adopting 48 Del. Laws, Chap. 320 (now found distributed in 29 Del.C. §§ 6908, 6909, 6910 and 6911) the Legislature spoke explicitly and in mandatory language concerning certain aspects of the contractor-subcontractor relationship and the duties of public authorities. The provisions apply to "any contract exceeding $5,000 in amount for the construction, alteration or repair of any public building of the State [of Delaware] * * *" (§ 6908) and it explicitly repealed all prior acts to the extent of any inconsistency. Considering the statutory purpose of the 1951 Act to regulate certain contractor-subcontractor relationships  I am satisfied that its broad mandatory language was intended to apply to all public buildings costing over $5,000 including those which the Division might build. I should add that at the time what is now § 6910 was enacted the State Highway Department operated the Bridge.
The Division points to the fact that the Highway Department was reorganized in 1955 and its power, etc., with relation to the Bridge were vested in the Delaware Interstate Highway Division. I find no conflict between the special statutes applicable to the Bridge and the more general statutes here involved. I believe the Division's difficulty is its reliance upon the statutes as they appear in the Code without making reference to their chronology. I do not find such provisions inconsistent with the application of § 6910 to the present contract.
The defendants next charge the plaintiff with unclean hands and also contend that its case is lacking in equity. Assuming without deciding that such defenses are appropriate on a taxpayer's action to prevent public authority from deviating from a mandatory statute, the answer here is that the statute itself called for a good faith evaluation and determination by the Division of the plaintiff's conduct insofar as the statute permitted it to do so. In saying this I am suggesting that the failure of a subcontractor to sign a reasonable contract with the general contractor could come within a workable interpretation of the "default in performance" provision *91 of the statute. However, it was up to the Division to get all the pertinent facts before sanctioning a substitution and, as I have held in connection with the restraining order application, § 6910 to be meaningful requires when possible that the public authority afford the "aggrieved" subcontractor an opportunity to present his version of the matter before taking action under the statute. Clearly such an opportunity could have been given here and yet it was not afforded this plaintiff. I adhere to my view that "fairness" demands that the aggrieved subcontractor be given the opportunity to state his case before it can be said that a good faith determination has been made.
But defendants say that all the evidence, including plaintiff's version, is now before the court and therefore the court should dispose of the matter. Passing over my natural reluctance to perform the function which the statute imposes on the Division, I still say that all the relevant facts are not before me. Plaintiff has said it is willing to perform in accordance with the usual type of contract. The relationship of plaintiff to the unions and management groups should be explained and plaintiff's version adduced before it is concluded that plaintiff's submission of a bid to O'Connell was in bad faith. It is for this reason that I believe the effective implementation of the statutory policy requires the authority to hear the "other party's side".
I conclude that under the circumstances of the case the plaintiff is not barred from preliminary relief by the clean hands doctrine or lack of "equity" in its cause.
There is no merit to defendants' claims that plaintiff has failed to show irreparable damages or the lack of an adequate remedy at law. This is an action to enforce a law binding on public authority. As a taxpayer at least, plaintiff is entitled to equitable relief in the present status of the matter. Compare Haddock v. Board of Public Education, 32 Del.Ch. 245, 84 A. 2d 157.
Defendants say a preliminary injunction should be denied because of inconvenience to the public. Assuming that this is a relevant consideration, I am satisfied that from the nature of the structure and the time of year that this factor is not important.
Defendants seem to argue that since plaintiff was replaced, even if illegally, the act is now complete and thus equity can afford no relief since equity will only award an injunction against future as distinguished from past acts. The building is still "in process" and a court of equity is not inhibited by such a narrow view of its powers and functions.
Finally, defendants say plaintiff is guilty of laches. I do not believe the present record supports this contention. The Division might well have resolved this matter had it given plaintiff an opportunity to be heard and then taken appropriate action.
A preliminary injunction in the same terms as those contained in the restraining order will be granted.
Present order on notice.